| | | |
|---|---|---|
| *In re:* | § | |
| | § | |
| **POINT COM, LLC,** | § | **CASE NO. 18-10762-TMD** |
| | § | |
| *Debtor* | § | **Chapter 11** |

## EMERGENCY MOTION OF THE DEBTOR FOR (I) AN ORDER APPROVING BIDDING PROCEDURES AND BIDDER PROTECTIONS FOR THE SALE OF CERTAIN DESIGNATED ASSETS; AND (II) AN ORDER APPROVING THE SALE OF CERTAIN DESIGNATED ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, AND ENCUMBRANCES PURSUANT TO 11 U.S.C. §§ 105, 363(B), (F), (M), AND 365, AND GRANTING RELATED RELIEF

TO THE HONORABLE TONY M. DAVIS, UNITED STATES BANKRUPTCY JUDGE:

COMES NOW Point Com, LLC, the above captioned debtor in possession (the "**Debtor**"), by and through its undersigned counsel, and hereby moves the Court (the "**Motion**") pursuant to sections 105, 363, and 365 of chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") for entry of (i) an order approving bidding procedures and bidder protections for the sale (the "**Sale**") of certain assets of the Debtor (the "**Purchased Assets**"), and (ii) an order (a) authorizing the sale of the Purchased Assets free and clear of all liens, claims, encumbrances, and other interests pursuant to sections 105, 363(b), (f), (m), and 365 of the Bankruptcy Code, (b) to the extent necessary, authorizing the Debtor to assume and assign executory contracts under section 365 of the Bankruptcy Code; and (c) granting related relief. In support of this Motion, the Debtor respectfully states as follows:

## JURISDICTION, VENUE, AND PROCEDURAL BACKGROUND

1.      The United States Bankruptcy Court for the Western District of Texas, Austin Division (the "**Court**"), has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

2.      This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      On June 14, 2018 (the "**Petition Date**"), Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, commencing the above-captioned chapter 11 case.

5.      The Debtor continues to operate and manage its business as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. As of the date of this Motion, the Office of the United States Trustee has not appointed an official committee of unsecured creditors.

## THE DEBTOR'S BUSINESS AND PROPOSED SALE

6.      The Debtor operates a website design and development and digital marketing business.  It has been in business since 1997, when its founder and its now-sole member/manager Steven C. Kahle, formed the company. In 2017, the Debtor had gross revenues of approximately $1,208,000.00.

7.      The Debtor has not been operating profitably for a number of years.  There are numerous other businesses that offer similar services in the marketplace.  As the financial performance of the Debtor worsened and its legal woes mounted, it sought possible buyers.  Mr. Kahle, having been in this industry for a number of years, is well aware of likely purchasers, which number approximately thirty (30).  Mr. Kahle contacted all such entities and only four or five have expressed serious interest.  Only one has expressed a definite willingness to proceed with a transaction in chapter 11.

8.     The Debtor's estate includes certain valuable Assets, including those Assets described in the list attached as **Exhibit A** to this Motion.  The Debtor is also a party to a number of executory contracts, which are listed in **Exhibit B**].[1]  The Debtor employs approximately ten people in the Austin area and has a number of customers that rely upon its services.  Although the Debtor's cash flow picture has improved somewhat since filing its bankruptcy petition and it is currently making its payroll and paying its current operating expenses while in the chapter 11 process, the Debtor has struggled for years to make its payroll and meet its ongoing financial obligations.  The Debtor has survived financially only because its Member/Manager, Mr. Kahle, has borrowed heavily and loaned funds to the Debtor from his personal assets to cover the Debtor's expenses.

9.     Since the filing of the company's bankruptcy petition, Mr. Kahle, on behalf of the Debtor, has successfully negotiated a Letter of Intent (the "**LOI**") with PHP Alliance LLC ("**Buyer**").  Buyer is a newly-formed, special-purpose entity that is an affiliate of an existing, successful, Austin-based company that provides services similar to those provided by the Debtor.  The Debtor's management believes the Buyer is not only financially well able to consummate a sale and perform the contracts that would be assigned by Buyer as part of the sale, but is also a "good fit" for the Debtor's employees and customers.  Pursuant to the LOI, the Buyer has agreed to conduct due diligence concerning the Assets and, if the proposed fourteen-day due diligence period is completed successfully, to serve as stalking-horse bidder for an auction for the Assets, per the terms reflected in the LOI.  A true and correct copy of the signed LOI is attached as **Exhibit C** to this Motion.  If the Buyer is the successful bidder for the Assets, the parties intend

---

[1] Both the asset list (Exhibit A) and the list of executory contracts (Exhibit B) are subject to further refinement and revision as the sale process progresses.  The intent of the parties to the LOI, as defined in Paragraph 9 below, is to include substantially all the Debtor's assets of the bankruptcy estate, except certain Excluded Assets, the identity of which will be determined during the due diligence period.

to memorialize the transaction in a written purchase agreement in due course. The proposed stalking-horse bid is Seventy-five Thousand Dollars ($75,000).

10.     In addition, in the event the Buyer opts not to proceed at the end of its due diligence, the Debtor will seek further relief from the Court. If the Debtor believes that the auction could go forward without the Buyer, it will so advise the Court, and request that the Court approve revised sale procedures, ideally involving a new stalking-horse bidder in place of the Buyer. If the Buyer opts out and the Debtor believes no other Qualified Bids are likely to be forthcoming, the auction and proposed sale may be cancelled, and the Debtor will return to this Court to propose some other sale process as may be appropriate.

11.     Accordingly, the Debtor requests that the Court enter (i) a bidding procedures order as soon as possible, and (ii) a sale order after the Court has held a Sale Hearing.

## RELIEF REQUESTED

12.     By this Motion, the Debtor seeks entry of two orders: ***First***, at an expedited hearing to be held on a date set by order of the Court, the Debtor requests entry of an order, in substantially the form attached hereto as **Exhibit D** (the "**Sale Procedures Order**"), among other things, (a) approving the Debtor's proposed procedures for submitting and considering competing bids for the Purchased Assets, including the proposed form and manner of notice and the related dates and deadlines (the "**Sale Procedures**"), and (b) approving the Debtor's proposed bidder protections for the Buyer as the stalking-horse bidder, as described below (the "**Bid Protections**").

13.     ***Second***, the Debtor requests the entry of an order (the "**Sale Order**") (a) authorizing the Sale of the Purchased Assets to the Buyer as stalking-horse bidder, or to a higher and better bidder, free and clear of all liens, claims, encumbrances, and other interests pursuant sections 105, 363(b), (f), and (m) of the Bankruptcy Code; (b) to the extent necessary,

authorizing the Debtor to assume and assign executory contracts under section 365 of the Bankruptcy Code; and (c) granting related relief.

## A.     <u>The LOI</u>

14.     On August 3, 2018, the Debtor and Buyer executed the LOI, which sets forth the proposed terms for due diligence, sale procedures, stalking horse bidder protections, and the proposed transaction.[2] The principal terms of the LOI are summarized and highlighted as follows:[3]

| Transaction | The Buyer will acquire designated Assets of the Debtor ("**Seller**"). |
| --- | --- |
| **Purchase Price** | The total consideration to be paid by Buyer under the Purchase Agreement (the "**Purchase Price**") consists of $75,000 in cash. |
| **Purchased Assets** | The Assets, including but not limited to: an assignment of all intellectual property owned or licensed by the Seller, including the assets listed on <u>Exhibit A</u>, all foreign and domestic patents or applications related to or arising out of any of the assets listed on Exhibit A, as well as any other foreign and domestic patents, pending patent applications, trademarks (registered and common law), pending trademark registrations, copyrights, pending copyright registrations, software, trade secrets, know-how, and any and all books, records, contracts, lab notebooks, drawings, technical manuals, operating manuals, pictures, web pages, engineering drawings, technical specifications, presentations, technical data, manufacturing procedures, purchase specifications and agreements related thereto. Assets shall also include an assignment of all licenses (to the extent assignable) and nondisclosure or inventions assignment agreements owned by Seller that relate to any of the foregoing or are otherwise necessary or useful to make, have made, practice, use, import or sell any of the technology embodied in the other Assets. All the Assets transferred to Buyer will be free and clear of any liens, claims and encumbrances and any such liens, claims or encumbrances will attach to the proceeds of the sale. Any assets not specifically transferred and assigned to Buyer, and any liabilities relating thereto, shall remain the property of Seller. |

---

[2] Defined terms not otherwise defined herein shall have the meaning ascribed to them in the LOI.
[3] To the extent there is any inconsistency between the description in this Motion or any resulting Order and the terms of the LOI or the eventual Purchase Agreement, the LOI or the Purchase Agreement shall control, and the terms of the Purchase Agreement shall control over the LOI.

| | |
|---|---|
| **Excluded Assets** | The Excluded Assets shall include all of Seller's assets aside from the Purchased Assets. |
| **Closing** | The Transaction will close at a date as soon as possible after the approval of the Transaction by the Bankruptcy Court, subject to satisfaction of all closing conditions and receipt of Bankruptcy Court approval of the Transaction. |
| **Deposit** | A good-faith deposit of 10% of the Purchase Price will be provided by any bidder aside from the Buyer. |
| **Due Diligence, Purchase Agreement, and Cure Notice** | The Buyer will have a fourteen (14) day due diligence period (the "**Due Diligence Period**") beginning upon the date of the filing of this Motion. Reasonably soon after the filing of this Motion, the Buyer and the Debtor will agree upon the form of the Purchase Agreement, and will file it with the Court and circulate it to all known potential bidders. (If Buyer opts out of the transaction prior to a form of Purchase Agreement being agreed upon, the Debtor shall draft and circulate a Purchase Agreement that is acceptable to the Debtor and is on commercially reasonable terms, so that potential buyers may consider whether they would like to proceed to make an offer even in absence of the Buyer.)

If at the end of the Due Diligence Period the Buyer opts not to proceed, then the Debtor will promptly provide notice to the Court and all potential bidders, and will seek revised approval for sale procedures if serious potential bidders have stepped forward; otherwise, the Debtor will seek to modify this sale process and propose to the Court some other means of proceeding. |
| **Relationship between Buyer and Debtor** | There is no relationship between the Buyer and Debtor. The transaction is an arm's length transaction, negotiated in good faith. The Debtor will have no relationship or connection with the Buyer after the consummation of the sale. |
| **Notice Timing** | Notice of the hearing on the motion to approve the motion to sell will be provided as is necessary under the circumstances. |
| **Cure Amount and Notice** | As soon as the information is reasonably available, notice of the form of the Purchase Agreement will be served along with proposed cure amounts (the "**Cure Notice**") to any parties to executory contracts that the Debtor determines need to be assumed and assigned in order for the transfer of the Assets to be effectuated. As provided for the in Sale Procedures Order, any objections to proposed cure amounts, or to the assumption or assignment, shall be filed by the Sale Objection Deadline—provided that the cure objection deadline shall not in any |

| | event be sooner than seven days after the Cure Notice is provided. |
|---|---|

15.     The terms and conditions of the proposed transaction are set forth in summary form in the LOI, and reference should be made to the LOI for additional terms. If the Buyer's Due Diligence period is concluded successfully and the Buyer is willing to proceed, then a Purchase Agreement shall be entered into between the Debtor and the Buyer. To the extent there is any inconsistency between the summary of the transaction set forth in this Motion or in the LOI and the terms in the Purchase Agreement, the Purchase Agreement shall control.

**B.      Proposed Bidding Procedures**

16.     The Debtor requests approval of the following procedures for submitting and considering bids for the Sale of the Purchased Assets, including the related dates and deadlines described below:

(a)     **Participation Requirements.** Parties interested in making a competing bid for the purchase of some or all of the Purchased Assets (each, a "**Potential Bidder**") will be required to execute a confidentiality agreement in form and substance acceptable to the Debtor prior to gaining access to the due diligence materials. The Buyer has already executed such an agreement.

(b)     **Due Diligence.** Potential Bidders will have a fourteen-day (14) day due diligence period beginning upon the date of the filing of this Motion, during which time Potential Bidders may seek due diligence access or additional information as may be reasonably requested by the Potential Bidder and that the Debtor, in its business judgment, determines to be reasonable and appropriate under the circumstances.

(c)     **Submission of Bids.** In order to qualify as a Qualified Bid (as defined below) for the Purchased Assets, a Potential Bidder must timely submit a written bid that satisfies the following criteria:

i.      The bid must exceed the Purchase Price by at least $50,000; *provided that*, if the Buyer opts not to proceed at the end of its Due Diligence Period and subject to Court approval of a revised process, a Qualified Bid may be approved at some other amount;

ii.     The bid must be accompanied by a cash deposit (in the form of either a cashier's check or wire transfer) in an amount equal to 10% of the

aggregate value of such bid (each, a "**Good Faith Deposit**"). Regardless of method of payment, all Good Faith Deposits must be remitted to Debtor's counsel, B. Weldon Ponder, Jr.;

iii.    The bid must be accompanied by an executed Purchase Agreement in substantially the form of the Purchase Agreement and a blackline showing any modifications the bidder is proposing, and that:

      a.    indicates which of the Purchased Assets such bidder proposes to acquire pursuant to the Purchase Agreement; and

      b.    does not contain any conditions to closing which are not contained in the Purchase Agreement (including financing and due diligence) or is based on terms or conditions any less favorable, or otherwise more burdensome or conditional than those set forth in the Purchase Agreement;

iv.    The bid must include a reference from a financial institution demonstrating that the Potential Bidder (or the entity that will furnish the funding required to consummate and perform under the Purchase Agreement) has sufficient available funds to close the transaction; and

v.    The bid must contain a written statement identifying the controlling interest holders in the acquiring entity and evidence that the board of directors (or comparable governing body) for the entity making the bid has fully authorized and approved the submission, execution, and delivery of the Purchase Agreement and the consummation of the transactions contemplated thereby.

vi.    The bid must be delivered to the following parties: (i) the Debtor, Point Com, LLC, Attention: Steve C. Kahle, Member/Manager, at email address steve.kahle@wlion.com ; (ii) the Debtor's counsel, B. Weldon Ponder, Jr., Attorney at Law, at email address welpon@austin.rr.com ; and (iii) counsel for the Buyer, Waller Lansden Dortch & Davis, LLP, Attention: Morris Weiss and Tyler Lane, at email addresses morris.weiss@wallerlaw.com and tyler.lane@wallerlaw.com .

(d)    **Qualification of Bid**. After a Potential Bidder has delivered a bid, the Debtor and its counsel will determine whether (i) the Potential Bidder has demonstrated the financial capacity to consummate the purchase of the Purchased Assets, (ii) is reasonably likely to be able to and willing to consummate the contemplated transactions, and (iii) has otherwise timely satisfied the requirements described above. If so, the Debtor shall designate such potential bidder as a "**Qualified Bidder**" and such bid as a "**Qualified Bid**," and will promptly notify such bidder and the Buyer of this determination.

(e) **Deadline for Submission of Bids**. The deadline for submitting any and all competing bids shall be no later than August 24, 2018 at 5:00 p.m. (prevailing Central time), or such other date as is established by the Court (the "**Bid Deadline**").

(f) **Auction**. In the event that Qualified Bids are received, the Debtor will conduct an auction (the "**Auction**") to determine the highest or best bid for the Purchased Assets on August 27, 2018, or such other date as may be established by the Court, at the law offices of the Debtor's counsel, located in the Spicewood Professional Offices, 4408 Spicewood Springs Road, Austin, Texas, beginning at 10:00 a.m. (prevailing Central time). The Auction may be adjourned by announcement of the adjournment at the Auction to those parties who appear thereat.

(g) **Auction Procedures**. Only Qualified Bidders who have submitted Qualified Bids will be eligible to participate at the Auction. At the Auction, Qualified Bidders will be permitted to increase and/or improve their bids, provided that Qualified Bidders concurrently increase their Good Faith Deposit to represent 10% of their most recent bid. The bidding at the Auction shall start and continue in increments of at least $50,000. The Buyer shall have the right, but not the obligation, to participate in the Auction, and shall be a Qualified Bidder entitled to participate in the Auction. The Auction shall continue in one or more rounds of bidding and shall conclude when no further bids are received. During each round of bidding, each participating bidder will have a reasonable opportunity to submit an additional subsequent bid with full knowledge of the then existing highest or best bid and the identity of the other party making the then highest or best bid. The Debtor may conduct the Auction in the manner it determines will maximize the value of the Purchased Assets. If there is no Qualified Bid from a party other than the Buyer, the Auction will be cancelled and the Buyer will be declared the Successful Bidder (defined below). The Auction will be transcribed or videotaped. Each bidder is expected to confirm at the auction that it has not engaged in any collusion with respect to the bidding or the sale. Absent irregularities in the conduct of the Auction, or reasonable and material confusion during the bidding, bids will not be considered after the Auction in closed.

(h) **Determination of Successful Bidder**. At the conclusion of the Auction, the highest or best bid, as determined by the Debtor consistent with these Bidding Procedures, shall be designated as the "**Successful Bidder**." The Debtor may designate the next highest or best bidder for the Purchased Assets at the Auction as the "**Backup Bidder**." However, a bidder may decline Backup Bidder status and have no obligation to close a transaction, and the Debtor may, in its sole business judgment, continue that same process to obtain a Backup Bidder from among other Qualified Bidders.

(i) **Sale Hearing**. Only in the event that the Successful Bidder is a party other than the Buyer, or an objection is timely filed to this Motion by the Sale

Objection Deadline (as defined below), the Court will hold a hearing to approve the Sale of the Purchased Assets to the Successful Bidder (the "**Sale Hearing**") on or before August 29, 2018, or such other date as is established by the Court. Any Sale Hearing shall be an evidentiary hearing and parties shall be prepared to present their evidence in support of or in opposition to the proposed Sale at the Sale Hearing. If the Successful Bidder fails to consummate the purchase of the Purchased Assets, the Backup Bidder will automatically be deemed the Successful Bidder.

(j) **Closing**. Closing shall take place promptly after the entry of the Sale Order, but in any event no later than on the first business day following the day that is fourteen days after the entry of the Sale Order and after the Sale Order has become a Final Order, or at such other time or place as Buyer and Seller may agree in writing.

(k) **Return of Good Faith Deposit**. The Good Faith Deposits of all Qualified Bidders shall be held in escrow by the Debtor's counsel and shall not become property of the Debtor's estate. Upon the closing of the Sale, the Good Faith Deposit of any Qualified Bidders that are not the Successful Bidder will be returned.

(l) **Reservation of Rights**. The Debtor reserves the right, in consultation with its professionals, and any Committee, if any, to alter these Bidding Procedures, and to establish procedures and rules during the Auction, as they may determine reasonably appropriate to maximize the value realized by the estates.

## C.    **Proposed Notice Procedures**

17.    Not later than three calendar days after the entry of the Sale Procedures Order, the Debtor will cause a notice of the Sale (the "**Sale Notice**"), to be sent by first-class mail postage prepaid, or by another method reasonably calculated to provide notice, to (i) the Office of the United States Trustee for the Western District of Texas; (ii) counsel for the Buyer; (iii) the Debtor's 20 largest creditors; (iv) all entities known to have expressed a bona fide interest in acquiring the assets being sold; (v) all affected federal, state, and local regulatory and taxing authorities; (vi) any entity asserting an interest in the Purchased Assets; and (vii) all other known parties-in-interest in this bankruptcy case (including any party who has entered an appearance and request for service of papers pursuant to FED. R. BANKR. P. 2002).

18.     The Debtor requests that the Court set a deadline of August 24, 2018, at 5:00 p.m. (prevailing Central time) (the "**Sale Objection Deadline**") as the deadline for any objection to the relief requested in this Motion to be filed with the Court and delivered to the following parties: (i) the Debtor, Point Com, LLC, Attention: Steve C. Kahle, Member/Manager, at email address steve.kahle@wlion.com ; (ii) the Debtor's counsel, B. Weldon Ponder, Jr., Attorney at Law, at email address welpon@austin.rr.com ; and (iii) counsel for the Buyer, Waller Lansden Dortch & Davis, LLP, Attention: Morris Weiss and Tyler Lane, at email addresses morris.weiss@wallerlaw.com and tyler.lane@wallerlaw.com . The Debtor requests that the Court deem this notice and opportunity to object to be sufficient for all purposes.

## EXECUTORY CONTRACTS

19.     In addition to those procedures set forth above, the Debtor also is seeking approval of certain procedures to facilitate the fair and orderly assumption, assumption and assignment, or rejection of certain of the Debtor's executory contracts and unexpired leases (each, as applicable, a "**Executory Contract**" or "**Unexpired Lease**," and, collectively, the "**Executory Contracts and Unexpired Leases**"), as may be designated in the purchase agreement or any other Successful Bid (the "**Assumption Procedures**"). The proposed Assumption Procedures are as follows:

(a)     <u>**Cure Notice**</u>. **Within seventy-two hours of entry of the Bid Procedures Order**, the Debtor shall file with the Court and serve via first class mail and/or electronic mail, a notice (the "**Cure Notice**") on all non-Debtor Contract and Lease counterparties (collectively, the "**Contract Parties**," and each, a "**Contract Party**").

(b)     <u>**Content of Cure Notice**</u>. The Cure Notice shall notify the applicable Contract Parties that the Executory Contracts and Unexpired Leases may be subject to assumption and assignment in connection with the proposed Sale Transaction and contain the following information: (i) identification of the applicable Executory Contracts and Unexpired Leases; (ii) the applicable Contract Parties; (iii) the Debtor's good faith estimate of the corresponding cure amounts required to cure any and all outstanding defaults under the Executory

Contracts and Unexpired Leases (the "**Cure Amount**"); and (iv) the deadline by which any Contract Party to an Executory Contract or Unexpired Lease may file an objection to the proposed assumption, assignment, cure, and/or adequate assurance and the procedures relating thereto; provided that service of a Cure Notice does not constitute an admission that such Executory Contract or Unexpired Lease is an executory contract or unexpired lease or that such Executory Contract or Unexpired Lease will be assumed at any point by the Debtor or assumed and assigned pursuant to the Purchase Agreement or any other Successful Bid.

(c) **Objections**. Objections, if any, to a Cure Notice must: (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Rules, Local Bankruptcy Rules, and any order governing the administration of this chapter 11 case; (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed Cure Amount, state the cure amount alleged to be owed to the objecting Contract Party, together with any applicable and appropriate documentation in support thereof; and (iv) be filed with the Court and served so as to be actually received by counsel to the Debtor by 5:00 p.m. (CDT), Monday, August 20, 2018. Any objection will be adjudicated on or before the Sale Hearing.

(d) **Effects of Filing an Objection to a Cure Notice**. A properly filed and served objection to a Cure Notice will reserve such objecting party's rights against the Debtor only with respect to the assumption and assignment of the Executory Contract or Unexpired Lease, at issue, and/or objection to the accompanying Cure Amount, as set forth in the objection, but will not constitute an objection to the remaining relief requested in this Motion. Any objection will be adjudicated on or before the Sale Hearing. Any relief that is required to be determined in an adversary proceeding must be obtained by such proponent prior to or in connection with the Sale Hearing. Any such relief that is not obtained by the proponent prior to or in connection with the Sale Hearing will be waived.

(e) **Expedited Discovery in Connection with Contested Matters**. Affected parties shall work cooperatively to schedule necessary depositions and discovery by agreement on an expedited basis. In the event the parties are not able to reach agreement, the Court may intervene and impose appropriate sanctions, as needed.

**D.    Proposed Stalking Horse Bid Protections**

20.    Subject to Bankruptcy Court approval, the LOI provides for the payment by the

Debtor, as Seller, to the Buyer, an "indefeasible work fee" in the amount of $50,000 (the "Work

Fee"), in order to compensate Buyer for diligence expenses that Buyer may incur during Buyer's

Due Diligence Period. The Buyer has already incurred, and will continue to incur during the Due Diligence Period, significant costs in the form of outside legal and accounting fees and the time and attention of its management and certain key employees to negotiate the terms of the LOI, to conduct the necessary due diligence and perform the role of stalking horse bidder. The Work Fee will be waived if the Debtor and Buyer close a sale of the Assets .

21.     The requested Work Fee was negotiated by the parties in good faith and at arm's length, primarily through counsel, with significant give-and-take. The Buyer has incurred substantial expenses in negotiating the purchase of the Purchased Assets, and such negotiations and the Buyer's offer for the Purchased Assets will maximize the value to be obtained from the Purchased Assets for the benefit of all creditors. The Buyer is not seeking any expense reimbursement. The Buyer has agreed to a fair and open Auction process that increases the chance of the maximization of value for the estate. As such, the Debtor has determined, in its business judgment, that the Work Fee is reasonable under the circumstances.

<u>**BASIS FOR RELIEF REQUESTED**</u>

**A.**     <u>**The Bidding Procedures are Appropriate and in the Best Interests of the Debtor's Estate and its Creditors**</u>

22.     The dominant goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. *See Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R, 650, 659 (Bankr. S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the . . . [debtor's] duty with respect to such sales is to obtain the highest price or greatest overall benefit

possible for the estate.") (quoting *In re Atlanta Packaging Prods., Inc.*, 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988)), *appeal dismissed*, 3 F.d 49 (2d Cir. 1993).

23.     As a result, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales. *See, e.g., In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("[C]ourt-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates."); *Integrated Res.*, 147 B.R. at 659.

24.     The Debtor believes it is in the best interests of its estate to commence a bidding procedure immediately, as the Debtor has limited funding and resources to proceed with a long sale process. The Bidding Procedures proposed herein allow for an expedited sale of the Debtor's assets that is necessitated by its circumstances. The Debtor also believes that the proposed Bidding Procedures will promote active bidding from seriously interested parties, and will provide a framework for an orderly and fair sale process that will encourage participation by financially capable bidders or will confirm that the Buyer's bid is the best and highest bid for the Purchased Assets. The proposed Bidding Procedures contain terms typical for a process through which a sale of this nature is consummated and should increase the likelihood that the Debtor will receive the greatest possible consideration for the Purchased Assets. The Bidding Procedures also set forth a schedule for achieving these objectives in an expeditious manner, balancing the Debtor's desire to maximize recovery for the benefit of the estates, with the need to move quickly to avoid any further deterioration in value. *See In re Texas Rangers Baseball Partners,* 431 B.R. 706 (Bankr. N.D. Tex. 2010) (approving shortened time frame of less than

three weeks between issuance of bidding procedures order by the Bankruptcy Court and auction sale of assets to preserve the value of the purchased assets).

**B.     The Notice Procedures are Appropriate**

25.     Under Bankruptcy Rule 2002, the Debtor is required to notify its creditors of any proposed sale of its assets, including a disclosure of the time and place of the Sale Hearing, the terms and conditions of the Sale and the deadline for filing any objections related thereto. The Debtor's proposed notice procedures, including the Sale Notice, include adequate information to (a) enable interested parties to bid on the Purchased Assets pursuant to the Sale Procedures Order, and (b) inform parties-in-interest of the Sale Hearing and the Sale Objection Deadline. As such, the Debtor believes that the notice to be provided by the mailing of the Sale Notice constitutes good and adequate notice and fully complies with Bankruptcy Rule 2002.

**C.     The Work Fee is Appropriate and in the Best Interests of the Debtor's Estate and its Creditors**

26.     In general, bid protections encourage a potential purchaser to invest the requisite time, money and effort to negotiate with a debtor and perform the necessary due diligence attendant to the acquisition of a debtors' assets, despite the inherent risks and uncertainties of the chapter 11 process. Typically, bidding incentives are judged under a business judgment standard, which proscribes judicial second-guessing of the actions of a corporation's board of directors taken in good faith and in the exercise of honest judgment. *See e.g.*, *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (holding that bidding incentives may "be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking" (internal quotation marks and citation omitted)). To receive administrative expense priority pursuant to section 503(b) of the Bankruptcy Code, the bidding incentive must provide some post-petition benefit to the estate. *Calpine Corp. v. O'Brien*

*Envtl. Energy, Inc.*, 181 F.3d 527, 535 (3d Cir. 1999) (identifying at least two instances in which bidding incentives may provide benefit to the estate: first, benefit may be found if "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited"; second, where the availability of bidding incentives induces a bidder to research the value of the debtor and submit a bid that serves as a minimum or floor bid on which other bidders can rely).

27.     Courts typically approve bid protections, like the Work Fee, in chapter 11 bankruptcy sales. *See, e.g., In re Lincolnshire Campus, LLC*, 2010 WL 5269706, at *1 (Bankr. N.D. Tex. July 23, 2010) (approving breakup fee and expense reimbursement under section 503(b) of the Bankruptcy Code in the context of a sale of substantially all of the debtor's assets under section 363 of the Bankruptcy Code); *In re Texas Rangers Baseball Partners*, 431 B.R. at 715 (same); *In re APP Plus*, 223 B.R. 870, 875 (Bankr. E.D.N.Y. 1998) (approving break-up fee in connection with sale of substantially all of the debtors' assets pursuant to 11 U.S.C. § 363(b)); *In re Kmart*, Case No. 02-B-02474 (Bankr. N.D. Ill. May 10, 2002) (authorizing a termination fee and overbid amounts for potential bidders).

28.     The Debtor believes that the Work Fee is fair and reasonable, an exercise of its sound business judgment, and that it provides a benefit to its estate. Specifically, the Buyer has engaged in extensive analysis and due diligence of the Debtor's assets, and has incurred significant expenses in negotiating the purchase of the Purchased Assets, for which it is not seeking reimbursement. As a result of the Buyer's efforts, the Debtor has secured a stalking horse bidder for assets, with a minimum price for the Purchased Assets that is fair, reasonable, and on which other bidders can rely. In light of the costs undertaken by the Buyer, the Work Fee serves as an inducement for the Buyer to conduct the costly due diligence necessary to provide a

competitive floor bid, and will compensate the Buyer for its risk in the event that it is not the Successful Bidder. This is especially important given that the Buyer is not seeking any reimbursement of the expenses it has incurred in negotiating the transaction.

29.     Moreover, if the Work Fee is triggered by a sale to a Successful Bidder other than the Buyer, it will be the result of the Debtor securing a higher and better offer for the Purchased Assets, which will benefit the Debtor's creditors. Consequently, the payment of the Work Fee will not diminish the Debtor's estate because it will only be payable if the Debtor consummates a sale that provides consideration that is greater than the Purchase Price by an amount sufficient to pay the Work Fee.

30.     The Debtor's agreement to pay the Work Fee is the product of good faith, arm's-length negotiations between the Debtor and Buyer. The Work Fee is fair and reasonable in amount, and it is reasonably intended to compensate the Buyer for the risk of being used as a stalking horse bidder and ultimately being outbid for the Purchased Assets. Thus, the payment of the Work Fee is a sound exercise of the Debtor's business judgment and will provide the a post-petition benefit to the Debtor's estate.

**D.      The Sale of the Purchased Assets Pursuant to the Purchase Agreement is Authorized by Section 363(b) of the Bankruptcy Code**

31.     Section 363 of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate . . . ." 11 U.S.C. § 363(b)(l). Section 105 provides in relevant part that "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

32.     A sale of a debtor's assets is authorized under section 363 of the Bankruptcy Code if there is a business justification for the sale. *Institutional Creditors of Cont'l Air Lines, Inc. v.*

*Cont'l Air Lines Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986); *see also Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (*citing Fulton State Bank v. Schipper (In re Schipper))*, 933 F.2d 513, 515 (7th Cir. 1991)); *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986). Among the factors in determining whether there is sufficient business justification for the sale, the bankruptcy judge:

> should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike. He might, for example, look to such relevant factors as the proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis–a-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions and, most importantly perhaps, whether the asset is increasing or decreasing in value. This list is not intended to be exclusive, but merely to provide guidance to the bankruptcy judge.

*In re Cont'l Air Lines, Inc.*, 780 F.2d at 1226 (*quoting Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.))*, 722 F.2d 1063, 1071 (2d Cir. 1983)). "Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litig. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). When a valid business justification exists, the law vests the debtor's decision to use property out of the ordinary course of business with a strong presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company." *In re Integrated Res.*, 147 B.R. at 656 (quoting *Smith v. Van Gorkom*, 488 A. 2d 858, 872 (Del. 1985)). Therefore, parties objecting to the Debtors' proposed sale must make a showing of "bad faith, self-interest, or gross negligence." *Integrated Res.*, 147 B.R. at 656.

33.     Moreover, the Bankruptcy Court has authority under section 105(a) of the Bankruptcy Code to approve non-ordinary course transactions under section 363(b) of the Bankruptcy Code. The Fifth Circuit has acknowledged that section 105 confers broad powers on bankruptcy courts:

> [Section] 105 [is] an omnibus provision phrased in such general terms as to be the basis for a broad exercise of power in the administration of a bankruptcy case. The basic purpose of § 105 is to assure the bankruptcy courts power to take whatever action is appropriate or necessary in aid of the exercise of their jurisdiction . . . .

*See Davis v. Davis (In re Davis)*, 170 F.3d 475, 492 (5th Cir 1999) (citation omitted). While the Debtor realizes that section 105(a) of the Bankruptcy Code "may only be used to carry out the provisions of Title 11," the underlying premise of chapter 11 is the continued and uninterrupted operation of the debtor in possession to the greatest extent possible. *In re CoServ, L.L.C.*, 273 B.R. 487, 494 n.9 (Bankr. N.D. Tex. 2002). Thus, the Debtor's requested relief is consistent with the "furtherance of the provisions of the Bankruptcy Code." *Id.*.

34.     The Debtor has proposed the sale of the Purchased Assets after thorough consideration of all viable alternatives, and has concluded that the Sale is supported by a number of sound business reasons. While the Debtor remains unsure of the most efficient course for its bankruptcy case to take, in any case the Assets are distinct and separable from the other parts of the Debtor's business, hence their sale for a significant sum enhances the prospects of maximization of value. Without the Sale, the Debtor does not see any possibility that it could sufficiently raise capital and engage in the necessary preparations and development that would be necessarily to utilize the Assets profitably. Hence, the Debtor has determined, in its considered business judgment, that a Sale of the Purchased Assets as requested herein provides the best and most efficient means for the Debtor to maximize the value of its estate, and avoid further deterioration in value.

35.     As a result of the Debtor's efforts to date, the Debtor believes that the Buyer's offer is reasonable, constitutes fair and reasonable consideration for the Purchased Assets, and will maximize value. The Purchase Agreement neither impermissibly restructures the rights of the Debtor's creditors nor impermissibly dictates a liquidation plan.

36.     Notwithstanding these determinations, however, the Debtor has also proposed a competitive bidding process in order to confirm that the Buyer's offer is the best and highest offer for the Purchased Assets.

37.     Based on the foregoing, the sale of the Purchased Assets is justified by sound business reasons and is in the best interests of the Debtor and its estate. Accordingly, pursuant to section 363(b) of the Bankruptcy Code, the Debtor requests approval of the sale to the Buyer as set forth herein.

**E.      The Sale of the Purchased Assets Free and Clear of Liens, Claims, and Interests is Authorized Under Section 363(f) of the Bankruptcy Code**

38.     The Debtor also requests that the Court authorize the Sale of the Purchased Assets to free and clear of any and all liens, claims, charges, encumbrances and interests (collectively, the "**Interests**"), which may be asserted or otherwise exist, with any such Interests to attach to the proceeds of the Sale of the Purchased Assets, subject to the rights and defenses of the Debtor, if any, with respect thereto.

39.     Section 363 of the Bankruptcy Code provides that a debtor may sell property of the estate free and clear of any other entity's interest in such property if:

(1)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2)     such entity consents;

(3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such Purchased Assets;

(4)     such interest is in a bona fide dispute; or

(5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

40.     While the term "any interest," as used in section 363(f), is not defined in the Bankruptcy Code, courts have held that the scope of section 363(f) of the Bankruptcy Code is not limited to *in rem* interests. *In re Leckie Smokeless Coal Co*., 99 F.3d 573, 581-82 (4th Cir. 1996); *Folger Adam Sec. v. DeMatteis/MacGregor, JV*, 209 F.3d 252, 258 (3d Cir. 2000) (citing 3 COLLIER ON BANKRUPTCY 363.06[1]). Thus, a debtor can "sell its assets under § 363(f) free and clear of successor liability that otherwise would have arisen under federal statute." *Folger Adam*, 209 F.3d at 258.

41.     Section 363(f) is drafted in the disjunctive. Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant the Sale of the Purchased Assets free and clear of all Interests, except with respect to any Interests that are Assumed Liabilities or Permitted Liens under the Purchase Agreement. *See Citicom Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988).

42.     The Debtor believes that each Interest that is not an Assumed Liability or Permitted Lien satisfies at least one of the five conditions in section 363(f) of the Bankruptcy Code. In particular, the proposed Sale Order will provide for all Interests to attach to the proceeds from the Sale of the Purchased Assets in the order of their priority and with the same validity, priority, force and effect which such Interests now have against the Purchased Assets, subject to the rights, claims, defenses, and other objections, if any, of the Debtor and parties in interest with respect to such Interests. The Debtor accordingly requests authority to convey the

Purchased Assets pursuant to the requested Sale Procedures, free and clear of all such Interests,

other than Permitted Liens and the Assumed Liabilities.

**F.     The Buyer is a Good Faith Purchaser and is Entitled to the Full Protections of Section 363(m) of the Bankruptcy Code**

43.     The potential stalking horse, the Buyer, is a good faith purchaser, entitled to the

protections of section 363 of the Bankruptcy Code. Specifically, section 363(m) of the

Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

44.     While the Bankruptcy Code does not define "good faith," courts have held that

there must be a showing of fraud or collusion between the purchaser and the debtor to

demonstrate a lack of good faith. *Bleaufontaine, Inc. v. Roland Int'l (In re Bleaufontaine, Inc.)*,

634 F.2d 1383, 1388 n.7 (5th Cir. 1981) ("Typically, the misconduct that would destroy a

purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser

and other bidders or the trustee, or an attempt to take grossly unfair advantage of other

bidders."); *see also Kabro Assocs. of West Islip, LLC v. Colony Hill Assocs. (In re Colony Hill

Assocs.)*, 111 F.3d 269, 276 (2d Cir. 1997) (same); *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d

143, 147 (3d Cir. 1986) (same). Courts generally determine that parties have acted in good faith

with respect to a proposed sale if the purchase price is adequate and reasonable and the terms of

the sale are disclosed fully. *See In re Abbotts Dairies*, 788 at 149-50.

45.     Here, the LOI was negotiated at arm's length, the Buyer has acted in good faith at

all times, and the agreements are not tainted by self-dealing, collusion or manipulation. The

Purchase Price is fair and reasonable, and the terms of the Sale have been fully disclosed and are subject to an active process to determine if a higher or better bid exists. Accordingly, the Debtor requests that the Court make a finding that the Buyer is a good faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code.

**G.**  **The Court Should Approve the Assumption and Assignment of Contracts Under Section 365 of the Bankruptcy Code**

46.     In connection with the approval of the Sale to the Buyer, the Debtor also requests approval of the assumption and assignment of contracts to the Buyer as necessary to effectuate the transfer of the Purchased Assets.

47.     Section 365 of the Bankruptcy Code permits a debtor to assign an executory contract or unexpired lease if "(A) the [debtor] assumes such contract or lease in accordance with the provisions of this section; and (B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease." 11 U.S.C. § 365(f)(2). Section 365(a) of the Bankruptcy Code authorizes a debtor to assume an executory contract or unexpired lease, and section 365(b)(1), in turn, codifies the requirements for such assumption, providing that:

> (b)(l) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee –
>
> (A)     cures, or provides adequate assurance that the trustee will promptly cure, such default . . . ;
>
> (B)     compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C)     provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1). The meaning of "adequate assurance of future performance" for the purpose of the assumption of executory contracts and unexpired leases pursuant to section 365 of the Bankruptcy Code depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See In re Texas Health Enters., Inc.*, 246 B.R. 832, 834 (Bankr. E.D. Tex. 2000); *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985).

48. It is well established that the decision to assume or reject an executory contract or unexpired lease is a matter within the "business judgment" of the debtor. *See In re Pilgrim's Pride Corp.*, 403 B.R. 413, 422-26 (Bankr. N.D. Tex. 2009); *Richmond Leasing Co. v. Capital Bank, N.A. (In re Richmond Leasing Co.)*, 762 F.2d 1303, 1309 (5th Cir. 1985); *Delightful Music Ltd. v. Taylor (In re Taylor)*, 913 F.2d 102, 107 (3d Cir. 1990). Accordingly, assumption or rejection of any executory contract is appropriate where the assumption or rejection would benefit the estate.

49. The assumption and assignment of any contracts necessary to the transfer of the Purchased Assets satisfies the requirements of section 365 of the Bankruptcy Code. First, to the extent that there is any default under any of the assumed contracts, the Purchase Agreement will provide that any such defaults will be cured as part of the transaction. Second, any buyer will be required to demonstrate sufficient ability to continue performance under each of the assumed contracts. To the extent necessary (or requested by any party in interest), the Buyer or any other Successful Bidder will demonstrate that adequate assurance of future performance is present. Thus, the requirements for assumption and assignment under section 365 of the Bankruptcy Code are satisfied.

50.     The assumption and assignment of the assumed contracts is an integral part of the Sale. The Sale of the Purchased Assets to the Buyer will provide significant benefit to the Debtor's estate and allow the Debtor, in its business judgment, to maximize the value of the Purchased Assets for the benefit of its estate. Thus, the assumption and assignment of any contracts necessary to the transfer of the Purchased Assets is a sound exercise of the Debtor's business judgment. Accordingly, the Debtor requests that the assumption and assignment be approved, notwithstanding any anti-assignment provisions therein.

### **REQUEST FOR RELIEF UNDER BANKRUPTCY RULE 6004(h)**

51.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." FED. R. BANKR. P. 6004(h).

52.     The Debtor requests that the Sale Order be effective immediately by providing that the 14-day stay under Bankruptcy Rule 6004(h) is inapplicable and waived, so that it may proceed as expeditiously as possible with the Sale. As described above, the Debtor believes that, absent a prompt sale, the value of the Purchased Assets will decline in value to the detriment of its creditors. Therefore, it is imperative that the Sale Order be effective immediately to permit the Sale to close without any further delay.

**A.     The Procedures for the Assumptions and Assignment of Contracts Should Be Approved.**

**1.     The Assumption and Assignment of the Executory Contracts and Unexpired Leases Reflects the Debtor's Reasonable Business Judgment.**

53.     Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign executory contracts and unexpired leases, subject to the approval of the Court, provided that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided. The debtor's decision to assume or reject an executory contract or unexpired lease

must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment. *See, e.g.*, *In re Penn Traffic Co.*, 524 F.3d 373, 383 (2d Cir. 2008) (business judgment test "rather obviously presupposes that the estate will assume a contract only where doing so will be to its economic advantage."); *In re Del Grosso*, 115 B.R. 136, 138 (Bankr. N.D. Ill. 1990) ("[T]he standard to be applied for approval of the assumption [of an executory contract] is the business judgment standard . . . .").

54.    Here, the Court should approve the decision to assume and assign the Executory Contracts and Unexpired Leases in connection with the Sale Transaction as a sound exercise of the Debtor's business judgment.

- First, the Executory Contracts and Unexpired Leases are necessary to the Debtor's operations, and as such, they are essential to inducing the best offer for the Debtor's assets.

- Second, it is unlikely that any purchaser would want to acquire any company on a going-concern basis unless a significant number of the Executory Contracts and Unexpired Leases needed to conduct the business and manage the day-to-day operations were included in the transaction.

- Third, the Debtor anticipates that the purchase agreement provides that the assumption and assignment of the Executory Contracts and Unexpired Leases is integral to, and inextricably integrated in, the sale.

- Finally, the Executory Contracts and Unexpired Leases will be assumed and assigned though the process approved by the Court pursuant and, thus, will be reviewed by key constituents in these Chapter 11 cases.

55.    Accordingly, the Debtor submits that the assumption and assignment of the Executory Contracts and Unexpired Leases by way of the assumption procedure should be approved as an exercise of its business judgment.

### 2.    Defaults Under the Assumed Contracts Will be Cured Through the Sale Transaction.

56.    Upon finding that a debtor has exercised its business judgment in determining that assuming an executory contract is in the best interest of its estate, courts must then evaluate

whether the assumption meets the requirements of section 365(b) and section 1123 of the Bankruptcy Code, as applicable: (a) that a debtor cure, or provide adequate assurance of promptly curing, prepetition defaults in the executory contract; (b) compensate parties for pecuniary losses arising therefrom; and (c) provide adequate assurance of future performance thereunder. This section "attempts to strike a balance between two sometimes competing interests, the right of the contracting non-debtor to get the performance it bargained for and the right of the debtor's creditors to get the benefit of the debtor's bargain." *Matter of Luce Indus., Inc.*, 8 B.R. 100, 107 (Bankr. S.D.N.Y. 1980).

57.     The Debtor submits that the statutory requirements of sections 365(b)(1)(A) and 1123(b)(2) of the Bankruptcy Code, as applicable, will be satisfied (and promptly) because the purchase agreement requires each buyer to represent that it is capable of curing all defaults associated with, or that are required to properly assume, the Executory Contracts and Unexpired Leases. Because the Order provides a clear process by which to resolve disputes over cure amounts or other defaults, the Debtor is confident that if defaults exist that must be cured, such cure will be achieved fairly, efficiently, and properly, consistent with the Bankruptcy Code and with due respect to the rights of Contract Parties.

**3.      Non-Debtor Parties Will be Adequately Assured of Future Performance.**

58.     Similarly, the Debtor submits that the third requirement of section 365(b)(1)(C) of the Bankruptcy Code—adequate assurance of future performance—is also satisfied given the facts and circumstances present here. "The phrase 'adequate assurance of future performance' adopted from section 2-609(1) of the Uniform Commercial Code, is to be given a practical, pragmatic construction based upon the facts and circumstances of each case." *In re U.L. Radio Corp.*, 19 B.R. 537, 542 (Bankr. S.D.N.Y. 1982). Although no single solution will satisfy every case, "the required assurance will fall considerably short of an absolute guarantee of

performance." *In re Prime Motor Inns Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Bygaph, Inc.*, 56 B.R. 596, 605−06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance present where a prospective assignee has financial resources and has expressed a willingness to devote sufficient funding to a business to give it a strong likelihood of succeeding).

59.     The Debtor believes that it can and will demonstrate that the requirements for assumption and assignment of the Executory Contracts and Unexpired Leases to the Successful Bidder will be satisfied. The Purchase Agreement will require buyer to provide adequate assurance of future performance to the extent required as to any Executory Contract or Unexpired Lease that is to be assumed and assigned. The Purchase Agreement will also require the buyer to represent that it is capable of curing any such defaults. Further, the proposed Assumption Procedures provide the Court and other interested parties ample opportunity to evaluate and, if necessary, challenge the ability of any Successful Bidder to provide adequate assurance of future performance, and object to the assumption of the Executory Contracts and Unexpired Leases on such basis. The Court therefore should have a sufficient basis to authorize the Debtor to reject or assume and assign the Executory Contracts and Unexpired Leases.

**B.      Relief Under Bankruptcy Rules 6004(h) and 6004(d) is Appropriate.**

60.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." The Debtor

requests that the Sale Order be effective immediately upon its entry by providing that the 14-day stay under Bankruptcy Rules 6004(h) and 6006(d) is waived.

61.     The purpose of Bankruptcy Rule 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d). Although Bankruptcy Rule 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay period, *Collier* suggests that the 14-day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 *Collier on Bankruptcy* ¶ 6004.11 (15 rev. ed. 2006). Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay should also be reduced to the amount of time actually necessary to file such appeal. *Id*.

62.     To maximize the value received for the Debtor's assets, the request that the Court waive the 14-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

## CONCLUSION

63.     **WHEREFORE**, the Debtor respectively requests that the Court (i) enter an order, substantially in the form attached as <u>Exhibit D</u>, approving the Bidding Procedures and Bid Protections; and (ii) enter an order (a) authorizing the Sale of the Purchased Assets to the Buyer or another Successful Bidder free and clear of all liens, claims, encumbrances, and other interests pursuant to sections 105, 363(b), (f), (m), and 365 of the Bankruptcy Code; (b) to the extent necessary, authorizing the Debtor to assume and assign executory contracts; and (c) granting such other and further relief to the Debtor as the Court may deem proper.

Dated: August 7, 2018

Respectfully submitted,

*/ s / Weldon Ponder*
B. WELDON PONDER, JR.
Attorney at Law
State Bar of Texas No. 16110400
4408 Spicewood Springs Road
Austin, Texas 78759
Phone 512.342.8222
Fax 512.342.8444
welpon@austin.rr.com

ATTORNEY FOR THE DEBTOR IN POSSESSION, POINT COM, LLC

## CERTIFICATE OF SERVICE

I hereby certify that on August 7, 2018, a true and correct copy of the foregoing pleading was served via this Courts ECF/CM notification system to all parties registered to receive such notice, via email to the parties listed below, and regular U.S. Mail to the parties on the attached Service List.

Robert Clary, PLLC
405 Windward Dr.
Murphy, Texas 75094
rclary662@gmail.com
*Counsel to 338 Industries, LLC d/b/a Stratified Data (filed Notice of Appearance)*

Jason A. Starks
Assistant Attorney General, State of Texas
at bk-jstarks@oag.texas.gov and
at sherri.simpson@oag.texas.gov
*Counsel to Texas Comptroller of Public Accounts (filed Notice of Appearance)*

Deborah Bynum
Office of the U.S. Trustee
903 San Jacinto, Room 230
Austin, Texas 78701
Deborah.A.Bynum@usdoj.gov
*Trial Attorney, United States Trustee*

*/ s / Weldon Ponder*
B. Weldon Ponder, Jr.